## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NEW TOUCH DIGITAL INC.                )
3124 DUMBARTON STREET, NW             )
WASHINGTON, DC  20007                 )
                                      )
       Plaintiff,               )
                                      )
       v.                       )     Civil Action No. _____
                                      )
VICTOR CHRISTOPHER CABRAL             )
1825 7TH STREET, #815                 )
WASHINGTON, DC  20001                 )
                                      )
       Defendant.               )
                                      )

## <u>COMPLAINT</u>

Plaintiff, New Touch Digital Inc. ("NTD"), by its counsel, hereby files the following Complaint against Defendant, Victor Christopher Cabral.

<u>Introduction</u>

1.     This is an action by NTD against its former Chief Technology Officer, Victor Christopher Cabral ("Cabral"), for violation of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, breach of fiduciary duty/employee duty of loyalty, fraud, negligent misrepresentation, breach of contract, and tortious interference with prospective economic advantage.

2.     This action is based on certain wrongful and malicious conduct in which Cabral engaged, both during and after his employment with NTD.  During his employment with NTD, Cabral knowingly misused NTD clinical data, concealed his actions in misusing that data, and presented research results which he knew to be unreliable but which he knew that NTD would rely upon in making business decisions.  After his employment resignation from NTD, Cabral

failed and refused to provide NTD with passwords, code, and other NTD intellectual property that NTD needed in order to reprocess and verify the integrity of company data and to conduct clinical trials of NTD's mobile health and data analytics product, and Cabral willfully destroyed that NTD property.

3.       As a result of Cabral's unlawful conduct, NTD has suffered substantial monetary damages relating to efforts that NTD needed to undertake in order to certify the integrity of existing clinical data, by restoring the compromised data assets and intellectual property that Cabral withheld and then destroyed after his employment resignation.  NTD has also suffered substantial monetary damages relating to a loss of market share and profits that NTD reasonably expected to earn if it had been able to complete its clinical trials and bring its mobile health and data analytics platform to market in a timely manner.

## Parties

4.       Plaintiff, New Touch Digital Inc., is a Delaware corporation that has its principal place of business in the District of Columbia.

5.       Defendant, Victor Christopher Cabral, is an adult individual who has his residence in the District of Columbia.

## Jurisdiction and Venue

6.       This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, which confers jurisdiction in federal district courts over all civil actions arising under the laws of the United States.

7.       This Court has personal jurisdiction over Cabral, based on his residency in the District of Columbia.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2), as Cabral resides in this district and is the only defendant in this action, and as a substantial part of the events and omissions giving rise to the claims in this case occurred in this district.

Background

New Touch Digital Inc.

9.      NTD is a health technology company that was founded in 2017 by Atila Omer, Dr. Alex Ksendzovsky, Dr. Jonathan Pomeraniec, and Cabral.

10.      NTD was created for the purpose of developing mobile health and data analytics software to optimize clinical care for sufferers of neurodegenerative diseases, such as Parkinson's disease, essential tremor, and Huntington's disease.

11.      The mobile health and data analytics software that NTD is developing involves the use of data from motion sensors located on personal wearable devices, such as Apple watches, in order to process and evaluate patterns of movement which can then be used to assess symptoms of neurodegenerative diseases.

12.      The tentative name of NTD's medical device product is "Neuro-RPM."

NTD's Position in the Marketplace

13.      There currently is no product on the market that is similar to the mobile health and data analytics software that NTD is developing to optimize clinical care for sufferers of neurodegenerative diseases, although, upon information and belief, other medical device manufacturers may be in the process of developing a similar product.

14.      Because medical device manufacturers other than NTD may be in the process of developing a medical device similar to the device that NTD is developing, NTD has sought to complete the development of its technology, validate that technology, and obtain approval or

clearance by the federal Food and Drug Administration ("FDA") on an expedited basis, in order to be the first manufacturer to market and sell a product of this nature.

15.     NTD expects that, by being first to market or at least early to market with its medical device, NTD will be able to capture a significant market share for the sale of mobile health and data analytics software to optimize clinical care for sufferers of neurodegenerative diseases.

<u>Cabral's Role with NTD</u>

16.     In addition to being one of four NTD co-founders, Cabral served as NTD's Chief Technology Officer, as one of four members of NTD's Board of Directors, and as NTD's Corporate Secretary.

17.     Cabral is a software developer who has a Bachelor of Science degree in nuclear science and nuclear engineering from the Massachusetts Institute of Technology.

18.     On June 6, 2017, in recognition of Cabral's status as a co-founder, Chief Technology Officer, Board member, and Corporate Secretary, NTD awarded Cabral 300 shares of common stock in NTD.

19.     As NTD's Chief Technology Officer, Cabral was a critical member of a small team of professionals who were involved in the development of NTD's medical device.

20.     Cabral's duties as NTD's Chief Technology Officer included leading the design and development of computer algorithms that were integral to the NTD medical device and the related mobile software platform; overseeing data collection and management of all digital information from clinical trials; assisting with the design of NTD's protocols for its clinical trials; and assisting with the development of regulatory and business strategy.

21.     In performing his duties for NTD, Cabral worked at NTD's offices at 2055 L Street N.W. in Washington, D.C., and at his personal residence in Washington, D.C.

22.     Cabral performed work for NTD on a laptop computer that he personally owned.

<u>Cabral's Entry into a Confidentiality and Intellectual Property Assignment Agreement</u>

23.     On or about June 6, 2017, in connection with the founding of NTD, Cabral entered into a Confidentiality and Intellectual Property Assignment Agreement ("Confidentiality Agreement") with NTD.  A copy of the Confidentiality Agreement is attached to this Complaint as Exhibit 1.

24.     Section 1(a) of the Confidentiality Agreement states as follows:

> <u>Confidential Information</u>.  (a) I agree that all information, whether or not in writing, concerning the Company's business, technology, business relationships or financial affairs which the Company has not released to the general public (collectively, "Confidential Information") is and will be the exclusive property of the Company. Confidential information also includes information received in confidence by the Company from its customers or suppliers or other third parties.  <u>Confidential Information</u> may include, without limitation, information on finance, structure, business plans, employee performance, staffing, compensation of others, research and development operations, manufacturing and marketing, strategies, customers, files, keys, certificates, passwords and other computer information, as well as information that the Company receives from others under an obligation of confidentiality.

25.     Section 1(b) of the Confidentiality Agreement states as follows:

> (b) I will not, at any time, without the Company's prior written permission, either during or after my Service Relationship, disclose any Confidential Information to anyone outside of the Company, or use or permit to be used any Confidential Information for any purpose other than the performance of my duties as a service provider of the Company.  I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure of all Confidential Information.  I will deliver to the Company all copies of Confidential Information in my possession or control upon the earlier of a request by the Company or termination of my Service Relationship.

26.     Section 4 of the Confidentiality Agreement states as follows:

> <u>Survival and Assignment by the Company</u>.  I understand that my obligations under this Agreement will continue in accordance with its express terms regardless of any changes in my title, position, duties, salary, compensation or benefits or other terms and conditions of my Service Relationship.  I further understand that my obligations under this Agreement will continue following the termination of my Service Relationship regardless of the manner of such termination and will be binding upon my heirs, executors and administrators.  The Company will have the right to assign this Agreement to its affiliates, successors and assigns.  I expressly consent to be bound by the provisions of this Agreement for the benefit of the Company or any parent, subsidiary or affiliate to whom I may be transferred without the necessity that this Agreement be reexecuted at the time of such transfer.

27.     Pursuant to Section 7 of the Confidentiality Agreement, the law of the State of Delaware applies to the Agreement.

The FDA Regulatory Process

28.     The marketing and distribution to consumers in the United States of any medical product, including NTD's software device, require that the product be approved or cleared by the FDA.

29.     In order to obtain FDA approval or clearance of a medical device of the type being developed by NTD, a device manufacturer must conduct clinical trials on the product, to establish the safety and effectiveness of the device, and must abide by clinical trial requirements and regulations established and enforced by the FDA.

30.     The clinical data that a device manufacturer presents to the FDA, to substantiate the manufacturer's medical claims regarding the device, must comply with research standards to ensure, among other things, that no false, fabricated, or misrepresented scientific findings are used to support the manufacturer's medical claims.

31.     In accordance with 21 C.F.R. § 807.87(k), a company that is submitting an application to the FDA must provide the FDA with a written, signed certification, stating as follows:

> I certify that, in my capacity as (the position held in company) of (company name), I believe to the best of my knowledge, that all data and information submitted in the premarket notification are truthful and accurate and that no material fact has been omitted.

32.     For purposes of FDA applications, a medical device manufacturer must obtain, from an independent clinical trial, the data that the manufacturer utilizes to validate the manufacturer's claims regarding the device.  The FDA requires independent validation data to be separate from developmental data in order to eliminate the possibility of bias.

33.     A device manufacturer's use of the same data for both developmental and validation purposes constitutes a serious misuse of data, resulting in the manufacturer's being unable to certify its FDA application, and thereby nullifying any prospect that the manufacturer will be able to obtain FDA approval or clearance.

<u>NTD's Independent Clinical Trial of its Medical Device</u>

34.     In January 2019, NTD initiated an independent clinical trial in order to develop a data set to enable NTD to validate medical claims that NTD would make to the FDA regarding NTD's medical device.  Specifically, NTD contracted with a prominent neurologist to collect clinical data, including inertial movement sensor data, from certain patients of the neurologist.

35.     NTD has undergone significant effort and has incurred significant expense to obtain a sufficient data set from the independent clinical trial, to enable NTD to use that data set for purposes of NTD's FDA application.

36.     NTD formalized its regulatory plan for the FDA application in April and May 2019, in meetings in which Cabral participated.

37.     In its formal regulatory plan, NTD designated that all data from the independent clinical trial would be used strictly as validation data, and would not be used for developmental purposes.

### Cabral's Misuse of FDA Validation Data and Concealment of His Misconduct

38.     As NTD's Chief Technology Officer, Cabral was solely responsible for the technical development of algorithms used in NTD's medical device and was the only person who had access to and knowledge of the raw sensor data to be used for that product development and regulatory validation.

39.     In the spring of 2019, Cabral's co-founders at NTD became concerned regarding Cabral's apparent lack of progress in developing the algorithms to be used in NTD's device, and regarding Cabral's failure to keep the co-founders informed regarding the progress that Cabral was making with product development.

40.     On May 3, 2019, NTD's President and co-founder, Atila Omer, sent an email to Cabral, in which Omer asked Cabral to provide certain information that would enable NTD's co-founders to better understand the progress of Cabral's work and algorithm development.

41.     Beginning no later than May 13, 2019, in violation of FDA regulatory requirements and in violation of NTD's formal regulatory plan, Cabral accessed validation data from the independent clinical trial, and incorporated that data into the development and testing of the algorithms that he was developing.

42.     On May 14, 2019, Cabral provided a progress report to NTD's co-founders, reporting on the progress of his development of the technology for NTD's medical device.  In that progress report, Cabral did not advise NTD's co-founders that he had accessed and used validation data for developmental purposes.

43.     System logs detailing Cabral's data usage reflect that, from at least as early as May 13, 2019 and continuing through at least June 16, 2019, Cabral accessed and used validation data from the independent clinical trial, for purposes of improving his algorithms and gaining illegitimate advantage in his technology development for NTD's medical device.

44.     In late May and early June 2019, Cabral periodically reported, to his co-founders, favorable results from his technology development.  At no point did Cabral disclose that he had accessed and used FDA validation data.

45.     Cabral willfully subverted NTD's instructions to him to preserve independent clinical trial data for FDA validation use only.

46.     Cabral's improper use of FDA validation data in building his algorithms coincided with NTD's request that he provide NTD's co-founders with information on the progress of his work and coincided with the co-founders' increased concerns over Cabral's lack of progress.

47.     Cabral's use of validation data to develop models and technology for NTD's medical device made his work product invalid and unusable.

48.     NTD acted upon, made material decisions, and made material representations based on NTD's understanding that Cabral had not used validation data for developmental purposes, including statements made in official presentations to FDA regulators, and in communications with existing and prospective investors, industry partners, clinical and medical collaborators, and prospective employees.

NTD's June 2019 Pre-Submission Application to the FDA

49.     In or about late May and early June 2019, Cabral participated directly in NDT's preparation of a clinical trial regulatory plan, to be included in a pre-submission application to the FDA.

50.     On June 6, 2019, NTD submitted a pre-submission application with its clinical trial regulatory plan to the FDA.

51.     In the clinical trial regulatory plan that Cabral helped prepare and that NTD submitted to the FDA on June 6, 2019, NTD stated, in relevant part, "No developmental data will be used in the validation data.  No validation data will be used for the development of the Neuro-RPM algorithm."

52.     At the time of Cabral's participation in the preparation of the clinical trial regulatory plan that NTD submitted to the FDA, and as of the time of the submission of that plan to the FDA, Cabral was aware that he had, on several occasions, accessed and used the validation data for purposes of the development of the algorithm for NTD's medical device, and that the representation that NTD was making in its clinical trial plan regarding the use of validation data was false.

Cabral's Attendance at NTD's August 2019 Meeting with the FDA

53.     On August 19, 2019, Cabral and other NTD officials attended a meeting with FDA regulators, at the FDA's offices in Silver Spring, Maryland, to discuss NTD's clinical trial and regulatory plan.

54.     At no time prior to or during the August 19, 2019 meeting with the FDA regulators did Cabral disclose to NTD or to the FDA that he had used validation data for

development purposes, or that the representation that NTD had made, in its June 6, 2019 submission to the FDA, regarding the use of validation data was false.

<u>NTD's Reduction of Cabral's Duties and Reassignment of Technology Development</u>

55.     By September 2019, Cabral had been unable to develop the technology for NTD's medical device and he continued to be unable to provide, to NTD's co-founders, progress reports that demonstrated that he was making progress on the development of that technology.

56.     In September 2019, based on Cabral's failure to develop the technology or to provide adequate progress reports, NTD's co-founders concluded, even without knowledge of Cabral's improper use of validation data, that Cabral was not capable of developing the technology and that the work product that he had prepared in developing the technology was useless.

57.     In September 2019, NTD made the decision not to utilize the work product that Cabral had developed, to reduce Cabral's duties with regard to the development of technology for NTD, and to contract with outside consultants for the development of that technology.

58.     After NTD implemented its decision to reduce Cabral's duties and to contract with outside consultants, Cabral displayed an increasingly antagonistic attitude and antagonistic behavior toward NTD employees, including its President, Atila Omer.

<u>Cabral's Employment Resignation in November 2019</u>

59.     On Sunday, November 3, 2019, Cabral notified NTD that he was resigning from his employment with NTD.

60.     Cabral's final day of employment with NTD was November 11, 2019.

61.     As of Cabral's last day of work, Cabral had not informed NTD that he had misused validation data for developmental purposes, contrary to the representations that NTD had made to the FDA, and NTD was not otherwise aware of Cabral's misuse of that data.

62.     Upon information and belief, Cabral made his decision to resign from the employment of NTD because he was aware that he had misused validation data, and in order to avoid employment termination and other employment consequences if NTD were to discover his misuse of that data.

63.     In connection with his employment resignation, Cabral demanded that NTD provide him with a separation agreement which included a full release of claims.

64.     Upon information and belief, the reason why Cabral demanded a full release of claims from NTD was because he expected that NTD would discover his misuse of validation data and because he wanted NTD, before discovering Cabral's misuse of the data, to release claims relating to his misuse of the data.

65.     NTD did not provide Cabral with a release of claims.

<u>Status of NTD as of Cabral's Resignation</u>

66.     As of Cabral's last day of work for NTD on November 11, 2019, NTD was engaged in clinical trials of its mobile health and data analytics platform.

67.     Given the potential of technology development that NTD's outside consultants were providing as of the time of Cabral's employment resignation, NTD expected that it would be able to obtain FDA approval of NTD's mobile health and data analytics platform, and therefore would be able to bring its product to market, by early 2020.  NTD further expected that it would be the first company to be able to market a product of this nature for persons suffering from neurodegenerative diseases.

Cabral's Exclusive Possession of Certain NTD
Intellectual Property as of the Time of His Employment Resignation

68.     As NTD's Chief Technology Officer, Cabral was the only person who had possession of and access to certain passwords, code, and other intellectual property that the Company needed in order to complete its clinical trials and to bring its product to market.

69.     Cabral maintained and stored, on his laptop computer, the password to NTD's Apple Developer Accounts under chris.cabral@newtouchdigital.com and NTD's Apple identification number and password under chris.cabral@newtouchdigital.com.

70.     Cabral was the only person who had access to this Apple identification number and to these passwords.

71.     NTD needed the Apple identification number and passwords in order to access NDT's Apple Developer Accounts, so that NDT could proceed with its clinical trials.

72.     For security reasons, Apple does not permit passwords to be freely or easily changed, and acquiring a new password from Apple is a process that takes several weeks.

73.     Cabral maintained and stored, on his personal laptop computer, NTD's Apple Watch Application Code Versions 1.2.2, 1.2.4, and 1.2.5.  The source code for these versions was not backed up in NTD's Github code repository.

74.     Cabral was the only person who had possession of and access to this application code.

75.     NTD needed the application code in order to complete the clinical trials and data collection that are necessary for FDA approval of NTD's mobile health and data analytics platform.

Cabral's Failure to Return the Intellectual Property
that NTD Needed in Order to Complete its Clinical Trials

76.     As of his last day of work for NTD, Cabral was aware that he was the only person who was in possession of certain NTD intellectual property, including but not limited to NTD's identification number and passwords for NTD's Apple Developer Accounts and Apple Watch Application Codes, and Cabral was aware that NTD would be unable to proceed with and complete its clinical trials without that intellectual property.

77.     Pursuant to Section 1(b) of the Confidentiality Agreement, Cabral was obligated to return, to NTD, all keys, certificates, passwords, and other intellectual property, upon Cabral's last day of work for NTD.

78.     In breach of Section 1(b) of his Confidentiality Agreement, Cabral failed to return the passwords and identification number to NTD's Apple Developer Accounts, the Apple Watch Application Code, and other NTD intellectual property, upon Cabral's last day of work for NTD.

79.     When Cabral failed to return NTD's intellectual property by Wednesday, November 13, 2019, NTD's President, Atila Omer, sent an email to Cabral on that date, requesting, inter alia, that Cabral turn over any Company property, including data and applications, as well as all keys, access cards, code, and data repositories.  A copy of Omer's November 13, 2019 email to Cabral is attached to this Complaint as Exhibit 2.

80.     Cabral provided limited cooperation in response to Omer's November 13, 2019 email requesting that Cabral turn over all property in his possession, and Cabral failed to turn over substantially all requested NTD property.

81.     On Tuesday, November 26, 2019, Omer sent a further email to Cabral, again requesting that Cabral return NTD's intellectual property.  A copy of Omer's November 26, 2019 email to Cabral is attached to this Complaint as Exhibit 3.

82.     Cabral ignored the request, contained in Omer's November 26, 2019 email, that Cabral return NTD's intellectual property.

83.     Cabral's failure and refusal to return NTD's intellectual property, including but not limited to NTD's identification number and passwords for NTD's Apple Developer Accounts and Apple Watch Application Code, delayed NTD's ability to proceed with and complete the clinical trials of its mobile health and data analytics platform.

84.     When Cabral had not returned NTD's intellectual property by early December 2019, NTD retained legal counsel to write to Cabral, to demand that he return that property.

85.     On December 9, 2019, NTD, through its counsel, emailed a letter to Cabral, which stated that Cabral has possession, custody, or control over certain confidential NTD business information and other NTD property, including but not limited to security keys, access cards, and data repositories; that that property belongs to NTD and "is critical to the Company's business;" that Atila Omer had requested that Cabral return the property but that Cabral had failed to return the property; that Cabral's actions in refusing to return the Company's business information constituted a violation of various legal obligations that Cabral owed to NTD; and that NTD would file a lawsuit against Cabral if he failed to return, to NTD, all security keys, access cards, code, data repositories and other NTD information and property that were within Cabral's possession, custody, or control.  A copy of the December 9, 2019 email from NTD's counsel to Cabral is included in the document that is attached to this Complaint as Exhibit 4.

<u>Cabral's Deliberate Destruction of the Intellectual</u>
<u>Property that NTD Needed in Order to Complete its Clinical Trials</u>

86.     After Cabral's receipt of the December 9, 2019 letter from NTD's counsel demanding that Cabral return NTD's intellectual property, Cabral wantonly and maliciously

destroyed that property by "wiping" his personal laptop clean of all NTD passwords, code, and other NTD intellectual property.

87.     By email from Cabral's legal counsel dated December 12, 2019, Cabral stated, in relevant part, "[I]n response to your letter claiming [Cabral] tortiously retained Company property, he wiped his personal laptop clean of any and all New Touch data, passwords, and other claimed proprietary information."  A copy of the December 12, 2019 email from Cabral's counsel is included in the document that is attached to this Complaint as Exhibit 5.

88.     In the December 12, 2019 email from Cabral's counsel, which he sent after Cabral had "wiped" his computer, Cabral disingenuously stated that he "was more than willing to help in any way he can," an offer that was meaningless in light of the fact that Cabral had already wiped his computer of the NTD intellectual property that NTD needed.

89.     Upon information and belief, the reasons why Cabral "wiped" his personal laptop computer after his employment resignation was to prevent NTD from discovering his improper use of NTD's validation data, and to cause harm to NTD by preventing NTD from being able to proceed expeditiously with its clinical trials.

90.     Cabral's "wiping" of his laptop computer to destroy NTD data, passwords, and other NTD intellectual property, with the knowledge that NTD had demanded the return of that property, that he was the only person in possession of that property, and that NTD needed the property in order to proceed with its clinical trials, was malicious and was done with the intent to cause substantial business harm to NTD.

91.     Cabral's failure and refusal to provide NTD with its Apple identification number and passwords, Apple Watch Application Code, and other intellectual property, and his deliberate destruction of that information in order to prevent NTD from recovering and using that

16

intellectual property, have substantially delayed NTD's completion of its clinical trials, have delayed NTD's ability to obtain FDA approval of NTD's mobile health and data analytics platform, have delayed NTD's ability to bring that product to market, and have jeopardized NDT's ability to obtain primacy of its product in the marketplace.

92.     Cabral's failure and refusal to provide NTD with its Apple identification number and passwords, Apple Watch Application Code, and other intellectual property, and his deliberate destruction of that information in order to prevent NTD from recovering and using that intellectual property, have caused NTD to incur costs and expenses relating to the replication and replacement of the intellectual property that Cabral withheld and then destroyed.

NTD's Learning of Cabral's Misuse of Validation Data

93.     By letter from NTD's counsel to Cabral's counsel dated December 20, 2019, NTD advised Cabral of NTD's intention to file a lawsuit against him based on Cabral's deliberate withholding and eventual destruction of NTD's intellectual property.

94.     In February 2020, through correspondence between counsel for NTD and Cabral, NTD learned for the first time that Cabral had misused validation data during his employment with NTD.

95.     As a result of Cabral's misconduct in misusing NTD's validation data, no part of Cabral's work or technical development relating to clinical data can or will be included in NTD's device application to the FDA.

Count I – Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030

96.     NTD incorporates herein by reference the allegations of Paragraphs 1 through 95 of this Complaint.

97. The Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), provides for civil and criminal remedies for certain types of unauthorized access to protected computers, resulting in damages to the complainant.

98. The CFAA prohibits, inter alia, the knowing transmission of a program, information, code, or command to a protected computer, where the transmission causes intentional damage without authorization. 18 U.S.C. § 1030(a)(5)(A).

99. Under the CFAA, a "protected computer" is "a computer which is used in or affecting interstate commerce or communication." 18 U.S.C. § 1030(e)(2)(B).

100. Under the CFAA, "damage" exists where the activity results in loss to "1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(A)(i)(I).

101. The laptop computer that Cabral used for NTD business purposes was a computer used in or affecting interstate or foreign commerce or communication, and therefore was a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2)(B).

102. Cabral's "wiping" of the laptop computer that he used for NTD business purposes constituted a knowing transmission of a command to a protected computer, within the meaning of 18 U.S.C. § 1030(a)(5)(A).

103. By "wiping" the laptop computer that he used for NTD business purposes, to permanently delete NTD identification numbers, passwords, code, and other intellectual property, Cabral caused intentional damage to NTD, within the meaning of 18 U.S.C. § 1030(a)(5)(A).

18

104.     Cabral acted without NTD's authorization and, in fact, contrary to NTD's requests and demands, in permanently deleting NTD identification numbers, passwords, code, and other intellectual property from the laptop computer that he used for NTD business purposes.

105.     Cabral's actions in violation of the CFAA have caused NTD damages, over a one-year period, aggregating well in excess of $5,000.00.

106.     Cabral's actions in "wiping" the laptop computer that he used for NTD business purposes, to permanently delete NTD identification numbers, passwords, code, and other intellectual property, therefore constitute a violation of the CFAA.

107.     As a result of Cabral's violation of the CFAA, NTD has suffered and will continue to suffer damages in the form of lost profits relating to the delay in clinical trials, delay in FDA approval, and delay in NTD's ability to bring, to market, NTD's mobile health and data analytics platform, and monetary damages for the costs and expenses incurred by NTD in replicating and replacing the passwords, code, and other intellectual property that Cabral failed and refused to return to NTD, and that he eventually destroyed by "wiping" his computer clean of that intellectual property.

<u>Count II – Breach of Fiduciary Duty/Employee Duty of Loyalty</u>

108.     NTD incorporates herein by reference the allegations of Paragraphs 1 through 107 of this Complaint.

109.     As a shareholder in NTD, a closely-held corporation, Cabral owed a fiduciary duty to NTD and his fellow shareholders to act at all times in the interest of NTD and not to engage in business conduct that was contrary to the interests of NTD.

110.     As an officer and employee of NTD's, Cabral owed a duty of loyalty to NTD to act at all times in the interest of NTD and not to engage in business conduct that was contrary to the interests of NTD.

111.     In using validation data for developmental purposes, as described in Paragraphs 38 through 48 of this Complaint, and in failing to disclose to NTD or the FDA his use of validation data for developmental purposes, Cabral breached his fiduciary duty as a shareholder of NTD's and his duty of loyalty as an officer and employee of NTD's.

112.     In failing to promptly return NTD's intellectual property and in "wiping" his personal laptop computer of that intellectual property, as described in Paragraphs 76 through 92 of this Complaint, Cabral breached his fiduciary duty as a shareholder of NTD's.

113.     Cabral's breaches of fiduciary duty as a shareholder of NTD's, and his breaches of duty of loyalty as an officer and employee of NTD's, have caused NTD damages in the form of lost profits relating to the delay in clinical trials, delay in FDA approval, and delay in NTD's ability to bring, to market, NTD's mobile health and data analytics platform, and monetary damages for the costs and expenses incurred by NTD in replicating and replacing the passwords, code, and other intellectual property that Cabral failed and refused to return to NTD, and that he eventually destroyed by "wiping" his computer clean of that intellectual property.

## Count III – Fraud

114.     NTD incorporates herein by reference the allegations of Paragraphs 1 through 113 of this Complaint.

115.     During his employment with NTD, Cabral made misrepresentations of material fact and omissions of material fact to NTD, relating to his use of validation data for developmental purposes.

116.    By making his misrepresentations and omissions of material fact, Cabral intended to deceive, mislead, and misinform NTD, and to cause NTD to rely upon those misrepresentations and omissions.

117.    Cabral knew that his misrepresentations and omissions of material fact were false at the time they were made, and knew that those misrepresentations and omissions would induce NTD to rely upon them.

118.    NTD reasonably relied upon the misrepresentations and omissions of material fact by Cabral, to the detriment of NTD, resulting in direct harm to NTD.

119.    The misrepresentations and omissions of material fact by Cabral constitute the tort of fraud against NTD.

120.    The misrepresentations and omissions of material facts by Cabral were made with actual malice, and with such recklessness or gross negligence as to evince a conscious disregard of the rights of others.

121.    As a direct and proximate result of Cabral's fraudulent conduct, NTD has suffered and will continue to suffer damages in the form of lost profits relating to the delay in clinical trials, delay in FDA approval, and delay in NTD's ability to bring, to market, NTD's mobile health and data analytics platform.

<u>Count IV – Negligent Misrepresentation</u>

122.    NTD incorporates herein by reference the allegations of Paragraphs 1 through 121 of this Complaint.

123.    During his employment with NTD, Cabral made misrepresentations of fact and omissions of fact to NTD, relating to his use of validation data for developmental purposes.

124.    Those misrepresentations and omissions of fact were material to NTD, and were negligently made with the intent that NTD would rely on them and take action in accordance with the misrepresentations and omissions.

125.    NTD reasonably relied on those misrepresentations and omissions, to the detriment and disadvantage of NTD, resulting in direct harm to NTD.

126.    As a direct result of Cabral's negligent misrepresentations and omissions, NTD has suffered and will continue to suffer damages in the form of lost profits relating to the delay in clinical trials, delay in FDA approval, and delay in NTD's ability to bring, to market, NTD's mobile health and data analytics platform.

<u>Count V – Breach of Contract</u>

127.    NTD incorporates herein by reference the allegations of Paragraphs 1 through 126 of this Complaint.

128.    The Confidentiality and Intellectual Property Assignment Agreement dated June 6, 2017 between Cabral and NTD constitutes a valid and enforceable agreement.

129.    Cabral has breached Section 1(b) of the Confidentiality Agreement by failing and refusing to return NTD's Apple identification number and passwords, Apple Watch Application Code, and other NTD intellectual property upon his last day of work for NTD, and by subsequently "wiping" his laptop computer to destroy that information.

130.    As a result of Cabral's breach of the Confidentiality Agreement, NTD has suffered damages in the form of lost profits relating to the delay in clinical trials, delay in FDA approval, and delay in NTD's ability to bring, to market, NTD's mobile health and data analytics platform, and monetary damages for the costs and expenses incurred by NTD in replicating and replacing the passwords, code, and other intellectual property that Cabral failed and refused to

return to NTD, and that he eventually destroyed by "wiping" his computer clean of that intellectual property.

Count VI – Tortious Interference with Prospective Economic Advantage

131.    NTD incorporates herein by reference the allegations of Paragraphs 1 through 130 of this Complaint.

132.    At all times relevant to this case, NTD had a reasonable business expectation that it would achieve an economic advantage by being the first to the market, or at least early to the market, with NTD's mobile health and data analytics software designed to optimize clinical care for sufferers of neurodegenerative diseases.

133.    At all times relevant to this case, Cabral knew of NTD's business expectation that NTD would achieve an economic advantage by being the first to the market, or at least early to market, with its product.

134.    Cabral intentionally interfered with NTD's business expectation, by misusing NTD's validation data for developmental purposes, by failing to disclose to NTD or to the FDA that he had used NTD's validation data for developmental purposes, and by withholding and then deliberately destroying the intellectual property that NTD needed in order to complete the clinical trials for NTD's product and to obtain FDA approval or clearance for that product.

135.    Cabral's interference with NTD's business expectation that it would achieve an economic advantage was wrongful and was accomplished through improper means.

136.    Cabral's interference with NTD's business expectation was not privileged.

137.    As a direct and proximate result of Cabral's interference with NTD's business expectation that NTD would achieve an economic advantage by being the first to market, or at least early to market, with its product, NTD has suffered and will continue to suffer substantial

monetary damages in the form of a loss of profits relating to the delay in NTD's ability to complete its clinical trials and obtain FDA approval of NTD's mobile health and data analytics platform for sufferers of neurodegenerative diseases, and costs and expenses incurred by NTD in replicating and replacing the passwords, code, and other intellectual property that Cabral failed and refused to return to NTD, and that he eventually destroyed by "wiping" his computer clean of that intellectual property.

138.    Cabral's failure and refusal to return NTD's intellectual property, and his destruction of that intellectual property by "wiping" his computer in order to deny NTD the use of that intellectual property, were malicious and outrageous, warranting an award of punitive damages.

WHEREFORE, Plaintiff, New Touch Digital Inc., respectfully requests the following relief from Defendant, Victor Christopher Cabral, on NTD's claims in this case:

a.    Monetary damages for profits lost as a result of the delay in clinical trials, delay in FDA approval, and delay in NTD's ability to bring, to market, NTD's mobile health and data analytics platform;

b.    Monetary damages for the costs and expenses incurred by NTD in reprocessing validation data to replace the validation data that Cabral corrupted through his misuse of that data;

c.    Monetary damages for the costs and expenses incurred by NTD in replicating and replacing the passwords, code, and other intellectual property that Cabral failed and refused to return to NTD, and that he eventually destroyed by "wiping" his computer clean of that intellectual property;

      d.      Disgorgement and repayment, to NTD, of the compensation paid to Cabral, and the cost to NTD of the employee benefits that NTD provided to Cabral, for the time period when he was in breach of his fiduciary duty/employee duty of loyalty to NTD;

      e.      Pre-judgment interest;

      f.      An award of punitive damages; and

      g.      Such other and further relief as the Court may deem to be appropriate.

<u>Jury Demand</u>

Plaintiff NTD hereby demands a jury trial on all claims so triable.


Dated:  July 10, 2020           Respectfully submitted,

**CLARK HILL PLC**

*/s/ Russell D. Duncan*
Russell D. Duncan, Esq. (DC Bar No. 366888)
Jeffrey J. Lorek, Esq. (DC Bar No. 975393)
Alexander R. Green, Esq. (DC Bar No. 1017781)
1001 Pennsylvania Avenue, N.W.
Suite 1300 South
Washington, DC  20004
Telephone:  (202) 640-6675
Facsimile:  (202) 552-2377
Email:       rduncan@clarkhill.com
Email:       jlorek@clarkhill.com
Email:       agreen@clarkhill.com

*Counsel for Plaintiff, New Touch Digital Inc.*